**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 15-cv-2615-WJM-KLM

RAYMOND ARMELINO,

      Plaintiff,

v.

RICK RAEMISCH, Executive Director of the Colorado Department of Corrections,
BARRY GOODRICH, Warden, Bent County Correctional Facility,
CYNTHIA COFFMAN, Attorney General, State of Colorado,

      Defendants.

---

**ORDER ADOPTING FEBRUARY 10, 2017 RECOMMENDATION OF THE
MAGISTRATE JUDGE AND DENYING WRIT OF HABEAS CORPUS**

---

      Plaintiff Raymond Armelino ("Armelino") is a parolee in the custody of the

Colorado Department of Corrections ("CDOC"). Armelino seeks a writ of habeas corpus

under 28 U.S.C. § 2254, claiming that certain alleged errors during his trial in state court

rendered his subsequent conviction unconstitutional. (ECF No. 1.) On February 10,

2017, United States Magistrate Judge Kristen L. Mix issued a recommendation that the

Court deny Armelino's request ("Recommendation"). (ECF No. 39.) Armelino has filed

an objection ("Objection"). (ECF No. 50.) Defendants filed no response.

      For the reasons set forth below, the Court agrees with the Magistrate Judge that

Armelino is not entitled to habeas relief. Accordingly, his application for such relief is

denied and this matter is terminated.

# I. BACKGROUND

Armelino was a physical therapist accused of various forms of sexual assault. Specifically, when treating a teenage female patient ("M.P."), he employed a muscle release technique that involved contact with the pectoral muscles, but Armelino allegedly went beyond the legitimate scope of the technique and instead fondled M.P.'s breasts. As summarized by the Colorado Court of Appeals,

> [t]he prosecution charged [Armelino] with sexual assault on a child by one in a position of trust, sexual assault on a child by one in a position of trust—pattern of abuse, and unlawful sexual contact, all related to M.P. Three other former patients made similar allegations after discovering Armelino's arrest through the media. The prosecution charged him with three additional counts of unlawful sexual contact.
>
> At trial, Armelino contended that the technique he was performing required him to touch the breasts of his female clients and that M.P. had misperceived the nature of his contact.
>
> The jury convicted him of the charges related to M.P., but acquitted him of the charges related to the other patients. The court imposed an indeterminate sentence of eight years to life on two counts, with shorter concurrent terms on the remaining counts.
>
> On direct appeal, a division of this court affirmed Armelino's convictions.
>
> Armelino then filed a Crim. P. 35(c) motion, alleging [various claims that the trial court found without merit].

(ECF No. 9-9 at 2–4 (citations omitted).)[1]

# II. ANALYSIS

Armelino seeks a writ of habeas corpus under 28 U.S.C. § 2254(d):

---

[1] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly in exhibits.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This statutory scheme can be broken out into a series of questions:

1.    Is the petitioner in custody pursuant to the judgment of a state court?

2.    Was the claim on which the petitioner bases his or her petition adjudicated on the merits in state court—or in other words, did the petitioner raise his or her claim in state post-conviction proceedings?

3.    Did the state court's decision on the petitioner's claim contradict or unreasonably apply federal law as established clearly by the United States Supreme Court?  Or, alternatively, did the state court's decision on the petitioner's claim rely on an unreasonable determination of facts in light of the evidence presented to the state court?

The Court will analyze these questions in turn, many of which raise sub-questions of their own.[2]

---

[2] There is an additional question whether Armelino's Objection is timely.  In light of his counsel's withdrawal just days after Judge Mix filed her Recommendation, the Court granted Armelino until March 6, 2017 to file an objection.  (*See* ECF Nos. 40, 42–43.)  The Court then granted another extension of that deadline, to April 14, 2017, but noted that "any objection must be received by the Clerk's office on or before that date (a postmark is not enough)."  (ECF No. 47.)  On April 13, 2017, the Clerk received Armelino's filing, but it was 45 pages long, far in excess of the undersigned's 15-page limit.  (ECF No. 48.)  The Court struck that filing but granted Armelino yet another extension, until April 24, 2017, to submit an objection of 15 pages or less.  (ECF No. 49.)  That order did not repeat the receipt-versus-postmark language of the

## A.     Custody

First, is Armelino in custody pursuant to the judgment of a state court?  Armelino was in CDOC custody as of the date he filed his petition on November 30, 2015.  (*See* ECF No. 48 at 2.)  This "is all the 'in custody' provision of 28 U.S.C. § 2254 requires." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).  Moreover, his release to "indeterminate parole" on January 18, 2017 does not moot his petition: "An incarcerated convict's (or a parolee's) challenge to the validity of his conviction always satisfies the case-or-controversy requirement, because the incarceration (or the restriction imposed by the terms of the parole) constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction." *Id.*  Thus, Armelino is in custody and his § 2254 petition remains ripe for adjudication.

However, Armelino "transferred his parole to New York on March 7, 2017."  (ECF No. 48 at 2.)  Thus, he is in some sense now in the custody of New York authorities.  No party has raised this issue, but the Court finds that it poses no obstacle.  "[T]he location of a collateral attack is best understood as a matter of venue, which means that both waiver and forfeiture are possible." *Moore v. Olson*, 368 F.3d 757, 758 (7th Cir. 2004). Here, the State has failed to object in any way to continuing venue in this Court. Furthermore, Armelino challenges the validity of his conviction by a Colorado court for a Colorado crime.  If this Court were to grant any relief, Colorado (not New York) would be required either to retry Armelino or to expunge his conviction.  Thus, the District of

---

prior order.  A day or two before the April 24 deadline, Armelino spoke by telephone with the undersigned's Judicial Assistant regarding filing procedures, and the undersigned's Judicial Assistant advised Armelino that his Objection would be deemed timely if postmarked by April 24.  Armelino placed his Objection in the mail on April 24, and his Objection was received by the Clerk on April 26.  (ECF No. 50.)  In these circumstances, and particularly in light of the advice Armelino received over the telephone, the Court deems his Objection timely.

Colorado remains the proper venue.

**B.      Exhaustion of Claims in State Court**

Next, did Armelino present his claims in Colorado post-conviction proceedings? Armelino asserts three claims for relief.  (ECF No. 1 at 20–32.)  The State conceded that Armelino's first and third claims had been properly exhausted through Colorado's post-conviction process.  (ECF No. 9 at 8, 10.)  The State asserted that Armelino's second claim had not been exhausted (*id.* at 9–10), but Magistrate Judge Gordon P. Gallagher—who was assigned to this case before Judge Mix—ruled to the contrary. (ECF No. 10 at 6–7.)  The State has not contested that ruling, but whether or not it was correct, it is now irrelevant because Armelino's Objection asserts only his first and third claims.  (ECF No. 50 at 1.)  He has therefore abandoned his second claim.  Thus, as to all claims still at issue, the parties agree that Armelino properly presented them to the Colorado courts.

**C.      Contradictory or Unreasonable Application of Clearly Established Law**

1.      Applicable Standards

Whether a state court decision contradicted or unreasonably applied clearly established federal law requires several inquiries of its own.

First, does the petitioner seek to apply a rule of law that was clearly established by the Supreme Court at the time his conviction became final?  *See Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Id.* at 412.  More specifically,

> clearly established law consists of Supreme Court holdings
> in cases where the facts are at least closely-related or
> similar to the case *sub judice.*  Although the legal rule at

5

> issue need not have had its genesis in the closely-related or
> similar factual context, the Supreme Court must have
> expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

Assuming clearly established law is at stake, the next question is whether the

state court's decision was contrary to or an unreasonable application of that clearly

established rule of federal law. *See Williams*, 529 U.S. at 404–05.

> A state-court decision is contrary to clearly established
> federal law if: (a) the state court applies a rule that
> contradicts the governing law set forth in Supreme Court
> cases; or (b) the state court confronts a set of facts that are
> materially indistinguishable from a decision of the Supreme
> Court and nevertheless arrives at a result different from that
> precedent. . . .
>
> A state court decision involves an unreasonable application
> of clearly established federal law when it identifies the
> correct governing legal rule from Supreme Court cases, but
> unreasonably applies it to the facts.  Additionally, we have
> recognized that an unreasonable application may occur if the
> state court either unreasonably extends, or unreasonably
> refuses to extend, a legal principle from Supreme Court
> precedent to a new context where it should apply.

*House*, 527 F.3d at 1018 (internal quotation marks and citations omitted; certain

alterations incorporated).

This is an objective inquiry.  *See Williams*, 529 U.S. at 409–10.  "[A] federal

habeas court may not issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly.  Rather that application must also be

unreasonable."  *Id.* at 411.

"[A] decision is 'objectively unreasonable' when most reasonable jurists

exercising their independent judgment would conclude the state court misapplied

Supreme Court law." *Maynard v. Boone*, 468 F.3d 665, 671 (10th Cir. 2006).

> Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks and citation omitted; certain alterations incorporated).

"[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (internal quotations marks omitted). Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671.

With these standards in mind, the Court turns to Armelino's two remaining claims for relief.

2.     Denial of Opportunity to Present a Complete Defense

Armelino's defense strategy was to avoid implying that M.P. had deliberately lied about the extent of Armelino's touching. Rather, Armelino intended to present evidence that M.P. had misperceived Armelino's limited touching as more extensive and intrusive than it actually was. (*See, e.g.*, ECF No. 23, May 4, 2007 Tr. at 68; May 25, 2007 Tr. at 200.) One path by which the jury might draw that inference was through expert testimony regarding the possibility that Armelino's pectoral release technique, as legitimately applied, could cause referred sensation elsewhere on the breast, including

the nipple.  (*See id.*, May 22, 2007 Tr. at 215.)  Armelino in fact presented this testimony to the jury.  (*See id.*, May 24, 2007 Tr. at 211–12.)

Armelino was prevented, however, from offering a second path.  Through pretrial proceedings, Armelino learned that M.P. had likely been sexually assaulted twice previously, once as a very young child and once quite recently before the physical therapy sessions that led to the charges against him.  As to the second of the two previous assaults, M.P. had no memory of the event other than going on a date with a particular boy and then being found the next morning by her mother in the passenger seat of her mother's van, upside down and naked save for her shirt wrapped around her neck.  (ECF No. 22, Court File at 0085.)  She also reported "dirt covered all over [her] and cum [*i.e.*, semen] everywhere."  (*Id.*)  Given this, Armelino hoped to introduce expert testimony from a clinical psychologist that, based on his review of M.P.'s sexual assault history, she likely suffers from post-traumatic stress disorder ("PTSD"); and, as a result, M.P. had likely become hypervigilant to potential sexual contact.  (*Id.* at 0086–88.)

Colorado has a rape shield statute declaring that a "victim's or a witness's prior or subsequent sexual conduct" is "presumed to be irrelevant" at trial, and requiring that any party seeking to introduce such evidence must make a written pretrial proffer to the trial court for a ruling on its admissibility.  *See* Colo. Rev. Stat. § 18-3-407(1), (2).  The Colorado Supreme Court has construed this statue to apply to nonconsensual sexual contact.  *People v. Weiss*, 133 P.3d 1180, 1185 (Colo. 2006).  Accordingly, Armelino submitted the required proffer, explaining the expected testimony from the clinical psychologist.  (ECF No. 22, Court File at 0084–88.)  The trial court rejected the proffer,

reasoning that Armelino had not overcome the presumption of irrelevance, and that the

proffered testimony would be otherwise excludable under Colorado Rule of Evidence

403 (which is materially identical to Federal Rule of Evidence 403):

> [I]t does not appear to me that this statute can reasonably be interpreted as broadly as the defense is urging that it be interpreted here.
>
> Basically, if the interpretation that is being urged upon the Court in this instance were accepted by Courts, every woman who has been subjected to physical or sexual abuse at any time in her past would be subject to having that opened up upon the allegation that, Well, maybe she misinterpreted this consensual contact as rape because maybe it triggered events from her past.
>
> Basically, this would, in my view, would open up a Pandora's box of grossly unfair inquiries into the sexual past of any woman who had ever been treated roughly or violently, either in a sexual nature or in some other kind of a nature. I know of no authority from this jurisdiction ever interpreting this statute this broadly, and I believe it would fly in the face of the purpose of the statute.
>
> And I believe that the relevance of it is so remote that, even if I thought the statute could be read that way, I wouldn't do it under 403, because it seems to me that the—well, I don't know how to put this—but it seems to me that the effort that we would go into in going into people's past just because maybe it could cause them to have false perceptions of the present would simply be an unreasonable waste of time, it would give rise to the realistic possibility that the trial would be conducted centered on things other than the allegations in the case, and I think even a 403 analysis would cause this Court to find that this kind of evidence wouldn't be admissible . . . .

(ECF No. 23, May 4, 2007 Tr. at 69–70.)

Armelino apparently challenged this ruling on direct appeal—no party argues that

he failed to do so—and he presented it again in state postconviction proceedings. The

Court has not located the state trial court's postconviction ruling on this question, but the

Colorado Court of Appeals rejected it for two reasons.

First, said the Court of Appeals,

> [i]f the proposed testimony was to be offered to explain the victim's misperception of defendant's intent, it is not relevant because the victim's perception of defendant's intent was not the issue; the jury must find that defendant had the intent to engage in sexual contact for purposes of sexual gratification or arousal. There was evidence to support such a finding independent of any perception of the victim.

(ECF No. 9-4 at 11–12.) This reasoning is difficult to follow. The court states that "the victim's perception of defendant's intent was not the issue" but it goes on to acknowledge that Armelino's intent *was* "the issue" and that other evidence supported a finding that Armelino possessed the relevant intent. The latter proposition may be true, but it does not explain why the victim's own perception is somehow irrelevant—indeed, it would seem to be highly relevant. Moreover, evidence that M.P. could have misperceived Armelino's intent is interconnected with whether her alleged hypervigilance could have caused her to misperceive the physical extent of Armelino's touching.

As it turns out, however, the Court of Appeals's second reason for rejecting Armelino's argument essentially covers this possibility:

> If the proposed testimony was offered to rebut the victim's perception that defendant touched her nipples during the treatment, it would have been cumulative of the expert testimony offered by defendant. This testimony was that the therapy applied by defendant could have caused M.P. to experience a sensation that her nipples were being touched when in fact the sensation was referred from touching other parts of her body.
>
> . . . . Therefore, [the] probative value [of the excluded evidence] if any was marginal, and when weighed against the prejudice of admitting the victim's prior sexual history, the balance was properly struck in favor of exclusion.

(ECF No. 9-4 at 12.)

Deeming the psychological evidence "cumulative" severely discounts its actual value. Armelino was in a difficult situation. Given that M.P. was a teenager at the time of the alleged offense and Armelino was a middle-aged man, a basic false-accusation defense would have been, in nearly all circumstances, unwise. Armelino instead needed to give the jury a reason to disbelieve M.P. without impugning her character, *i.e.*, without requiring the jury to conclude that M.P.'s accusations were deliberate lies. Armelino's evidence that the muscle release technique could refer sensation to the nipples was one part of that strategy. The other part was the expert testimony tending to show M.P.'s likelihood for hypervigilance as to potential sexual contact. Each part independently, and particularly both parts combined, could have led a jury to accept Armelino's theory that M.P.'s accusations flowed from a good faith misperception—but a misperception nonetheless—of what Armelino had actually done.

Even so, the question is not whether this Court would, in the first instance, have made the same ruling as the trial court or the Colorado Court of Appeals. Rather, this Court must ask whether those courts contradicted or unreasonably applied clearly established federal law as declared by the Supreme Court. In this case, the Supreme Court itself has answered that question, explicitly declaring that it has never clearly established the law applicable to these circumstances. The relevant decision is *Nevada v. Jackson*, 133 S. Ct. 1990 (2013).

Calvin Jackson was charged in Nevada state court with raping and otherwise assaulting his former girlfriend. *Id.* at 1990–91. Jackson's defense was that the former girlfriend

> had fabricated the sexual assault and had reported it to
> police in an effort to control [Jackson]. To support that
> theory, the defense sought to introduce testimony and police
> reports showing that [the former girlfriend] had called the
> police on several prior occasions claiming that [Jackson] had
> raped or otherwise assaulted her. Police were unable to
> corroborate many of these prior allegations, and in several
> cases they were skeptical of her claims. Although the trial
> court gave the defense wide latitude to cross-examine [the
> former girlfriend] about those prior incidents, it refused to
> admit the police reports or to allow the defense to call as
> witnesses the officers involved.

*Id.* at 1991. The trial court's ruling was motivated by a Nevada statute that "is akin to the widely accepted rule of evidence law that generally precludes the admission of evidence of specific instances of a witness'[s] conduct to prove the witness'[s] character for untruthfulness." *Id.* at 1992–93.

The jury found Jackson guilty, and he was sentenced to life imprisonment. *Id.* at 1991. Jackson appealed to the Nevada Supreme Court, arguing "that the trial court's refusal to admit extrinsic evidence relating to the prior incidents [*i.e.*, the police reports, or testimony from the police officers themselves] violated his federal constitutional right to present a complete defense." *Id.* The Nevada Supreme Court disagreed, and Jackson then exhausted his state postconviction remedies, followed by a § 2254 petition in federal court. *Id.* at 1991–92. The federal district court denied relief but the Ninth Circuit reversed. *Id.*

The Ninth Circuit's outcome rested on an assumption that the Supreme Court had clearly established a general constitutional right to present a complete defense:

> A criminal defendant has a well-recognized constitutional
> right to present a complete defense. *Crane v. Kentucky*, 476
> U.S. 683, 690 (1986) ("Whether rooted directly in the Due
> Process Clause of the Fourteenth Amendment, or in the
> Compulsory Process or Confrontation clauses of the Sixth
> Amendment, the Constitution guarantees criminal

> defendants a 'meaningful opportunity to present a complete defense.'"). Necessary to the realization of this right is the ability to present evidence, including the testimony of witnesses. *Washington v. Texas*, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.").

688 F.3d 1091, 1096 (9th Cir. 2012) (parallel citations omitted). The Ninth Circuit then invoked two of its own recent decisions in which it had ordered § 2254 relief based on a state court's refusal to permit cross-examination of a victim based on the victim's alleged prior sexual experiences. *Id.* at 1098–99 (citing and analyzing *Fowler v. Sacramento Cnty. Sheriff's Dep't*, 421 F.3d 1027 (9th Cir. 2005), and *Holley v. Yarborough*, 568 F.3d 1091, 1099 (9th Cir. 2009)).[3] The Ninth Circuit found that its "conclusions in *Fowler* and *Holley* apply even more strongly to the evidence in Jackson's case. . . . Evidence that would have undermined [the former girlfriend's] credibility was central to Jackson's theory that this was just another instance in which [the former girlfriend] made false or exaggerated claims against him to the police." *Id.* at 1100. As part of this analysis, the Ninth Circuit inserted a footnote it perhaps now regrets:

> Both *Fowler* and *Holley* involved a trial court's limitation on the scope of cross-examination as well as its rulings that prevented the introduction of extrinsic evidence to challenge the complainant's credibility. While our discussion of those

---

[3] Armelino leaned heavily on the Ninth Circuit's *Fowler* decision in his postconviction brief to the Colorado Court of Appeals, given that *Fowler* involved evidence that the victim had become particularly sensitive to possible sexual contact due to a prior alleged sexual assault. (ECF No. 9-2 at 31–33.) *See also Fowler*, 421 F.3d at 1032–33.

cases were grounded in the confrontation clause of the Sixth
Amendment, the Supreme Court has held that the analysis is
the same whether the exclusion is framed as a limitation on
the right to confront or the right to present a defense; in
either case, a constitutional violation occurs only when the
exclusion is arbitrary or disproportionate to the purposes of
the rule under which it is excluded. *Michigan v. Lucas*, 500
U.S. 145, 151 (1991) ("Restrictions on a criminal defendant's
rights to confront adverse witnesses and to present evidence
'may not be arbitrary or disproportionate to the purposes
they are designed to serve.'" (internal citation omitted)).

*Id*. at 1100 n.6 (parallel citations omitted).

Nevada appealed and the Supreme Court unanimously reversed in a *per curiam*

opinion. In particular, the Court rejected the notion that its Confrontation Clause

jurisprudence had clearly established the principles applicable to other aspects of the

right to present a defense:

> In holding that respondent is entitled to habeas relief, the
> Ninth Circuit pointed to two of its own AEDPA decisions in
> which it granted habeas relief to state prisoners who were
> not allowed to conduct a full cross-examination of the
> witnesses against them. 688 F.3d, at 1098–1101
> (discussing *Fowler v. Sacramento Cty. Sheriff's Dept.*, 421
> F.3d 1027, 1035–1038 (C.A.9 2005) and *Holley v.
> Yarborough*, 568 F.3d 1091, 1098–1101 (C.A.9 2009)).
> Those cases in turn relied on Supreme Court decisions
> holding that various restrictions on a defendant's ability to
> *cross-examine* witnesses violate the Confrontation Clause of
> the Sixth Amendment. See, *e.g.*, *Olden v. Kentucky*, 488
> U.S. 227, 231 (1988) (*per curiam*); *Delaware v. Van Arsdall*,
> 475 U.S. 673, 678–679 (1986); *Davis v. Alaska*, 415 U.S.
> 308, 315–316 (1974). But this Court has never held that the
> Confrontation Clause entitles a criminal defendant to
> introduce *extrinsic evidence* for impeachment purposes.
> See *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) (*per
> curiam*) (observing that "the Confrontation Clause is
> generally satisfied when the defense is given a full and fair
> opportunity to . . . expose [testimonial] infirmities through
> cross-examination"). See also *Jordan v. Warden*, 675 F.3d
> 586, 596 (C.A.6 2012); *Brown v. Ruane*, 630 F.3d 62, 70
> (C.A.1 2011).

The Ninth Circuit elided the distinction between cross-examination and extrinsic evidence by characterizing the cases as recognizing a broad right to present "evidence bearing on [a witness'] credibility." 688 F.3d, at 1099. By framing our precedents at such a high level of generality, a lower federal court could transform even the most imaginative extension of existing case law into "clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). In thus collapsing the distinction between "an *unreasonable* application of federal law" and what a lower court believes to be "an *incorrect* or *erroneous* application of federal law," *Williams v. Taylor*, 529 U.S. 362, 412 (2000), the Ninth Circuit's approach would defeat the substantial deference that AEDPA requires.

133 S. Ct. at 1994 (emphasis in original; parallel citations omitted).

This Court agrees with much of the Ninth Circuit's reasoning in *Jackson,* and fails to see how its compelling analysis can in any fair way be labeled "imaginative." Unfortunately for Armelino, however, the Supreme Court's ruling controls, and it is fatal to his claim, given that it turns on his ability to introduce extrinsic evidence. The only Supreme Court case Armelino cites to show clearly established law is *Olden v. Kentucky*, 488 U.S. 227 (1988). (*See* ECF No. 1 at 21; *see also* ECF No. 50 at 10.) But the above-quoted portion of *Jackson* shows that the Supreme Court views *Olden* as probative only of Confrontation Clause issues, not of the more-general right to present a complete defense.

Moreover, other portions of *Jackson*'s analysis make it difficult for Armelino to argue against the Colorado courts' application of the rape shield statute in his case. "Only rarely have we held," said the Court, "that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." 133 S. Ct. at 1992. In those rare instances, it has been because the "rule did not rationally serve any discernible purpose," it was "arbitrary," the state "did not even attempt to

explain the reason for its rule," or the "rule could not be rationally defended." *Id.* In addition,

> The admission of extrinsic evidence of specific instances of a witness' conduct to impeach the witness' credibility may confuse the jury, unfairly embarrass the victim, surprise the prosecution, and unduly prolong the trial. No decision of this Court clearly establishes that the exclusion of such evidence for such reasons in a particular case violates the Constitution.

*Id.* at 1993–94.

Colorado courts have justified the rape shield statute generally, and particularly its extension to prior instances of sexual assault, as a means of preventing unfair embarrassment to the victim. *People v. Villa*, 240 P.3d 343, 354 (Colo. App. 2009) (in a case involving an attempt to introduce evidence of a prior sexual assault, reasoning that "section 18-3-407 is a rational attempt by the legislature to [among other things] protect the complainant from harassment and humiliation"); *People v. Kyle*, 111 P.3d 491, 498 (Colo. App. 2004) ("The unfair prejudice that would have resulted from the admission of [evidence of a prior sexual assault], in the form of the victim's humiliation and psychological abuse, is precisely what the statute prohibits."). Moreover, in this case, the trial court excluded Armelino's proffered evidence because it would unduly prolong the trial and perhaps confuse the jury, while the Court of Appeals found it "cumulative" (which is closely connected to prolonging the trial). Thus, it appears that the Colorado courts' various reasons for rejecting Armelino's proffer are essentially unreviewable under the present state of Supreme Court jurisprudence.

As a consequence, the Court is left with no option but to conclude that no clearly established Supreme Court case law could have informed the Colorado courts' decisions, and this Court accordingly may not grant § 2254 relief to Armelino on his

claim that he was deprived of his right to a complete defense.

3.  Ineffective Assistance of Counsel in Plea Bargaining

In state postconviction proceedings, Armelino alleged that his defense attorney never informed him, prior to the conviction, that the charges he faced could lead to a mandatory prison sentence of indeterminate length, up to life.  (ECF No. 22, Court File at 0262.)

> [W]henever defendant asked his trial counsel what the worst case scenario would be, counsel indicated that defendant "would do not go to prison."  When defendant inquired about the possibility of plea bargaining, counsel further informed defendant that he needn't worry because the defense case was a "slam dunk."
>
> After defendant was convicted, his attorney informed him for the first time of the applicable lifetime sentence.  At that time, counsel also informed defendant that the prosecutor had offered a plea bargain involving a determinate sentence and probation, but that counsel, without defendant's knowledge or consent, told the prosecutor that defendant was not interested.  If defendant had known of the potential lifetime sentence, he would have instructed counsel to engage in plea bargaining and would have accepted the prosecution's offer.

(*Id.*)

The trial court held an evidentiary hearing on this matter at which Armelino, his defense attorney, and the prosecutor testified, among others.  Armelino testified consistent with the argument just quoted, and added that his most important priority was maintaining his relationship with his daughter.  Thus, he said, he would have accepted a plea deal that did not involve a mandatory minimum or indeterminate sentence.  (ECF No. 23, Aug. 18, 2011 Tr. at 135–37.)

The defense attorney admitted having never discussed the potential sentencing range with Armelino before his conviction, instead assuming that Armelino already knew

given that Armelino had spoken with "several attorneys" before hiring him.  (ECF No. 23, Aug. 18, 2011 Tr. at 56–58, 81.)  The defense attorney further admitted that he first discussed the applicable sentencing range with Armelino in the days after the conviction.  (*Id.* at 59.)  The defense attorney otherwise disputed Armelino's version of events.  The defense attorney stated that the prosecutor had approached him around the time of arraignment to inquire whether Armelino wanted to engage in plea negotiations, and the defense attorney replied in the negative because Armelino was adamant that he could get the charges dismissed at the forthcoming preliminary hearing.  (*Id.* at 72–73.)  According to the defense attorney, Armelino also directed that he could not accept any deal that involved loss of his physical therapist's license or registration as a sex offender.  (*Id.* at 75–78.)

The prosecutor testified that he made no plea offer and that he would not have made any plea offer after the preliminary hearing because his "practice was . . . that if we went to preliminary hearing we were going to go to trial on the case barring a plea to the charges as charged"—a practice from which he had deviated only once, where the victim's extreme drug abuse made her unable to testify.  (ECF No. 23, Aug. 19, 2011 Tr. at 37–39.)  When asked if he would have considered a plea deal involving a determinate sentence, he answered, "I doubt it . . . barring some sort of issues as far as evidence or something of that nature, unavailability of witnesses, or something like that."  (*Id.* at 39–41.)  When asked if he would have considered a plea deal through which Armelino could avoid registering as a sex offender, the prosecutor responded, "Given the information I had on this case and throughout this case, no."  (*Id.* at 42.)  When asked if he would have considered a plea deal involving only probation, he replied,

"With the information I had and the availability of the case, no." (*Id.*)[4] When asked if he would have considered an *Alford* plea (*i.e.*, a guilty plea where the defendant nonetheless continues to protest his or her innocence, *see North Carolina v. Alford*, 400 U.S. 25 (1970)), the prosecutor answered, "No." (*Id.* at 36.)

Following the hearing, the trial court issued a written order with its findings and conclusions. In pertinent part, the trial court found against Armelino as follows:

> While the case was proceeding through the pre-trial and trial stages, defendant was quite focused on the effect that a conviction would have on his business and his professional license. At that time, it seemed that the threat of loss of his business and his profession was of greater moment than the risk of incarceration. . . .
>
> Defendant has continued to consistently claim factual innocence during his incarceration. . . .
>
> For these reasons, and based upon considerations of general credibility, the court finds that the defendant, even if fully informed, would not have admitted guilt and entered a guilty plea to a charge that required lifetime registration as a sex offender. He would not have been offered any plea bargain that did not include admitting guilt and registering as a sex offender. Such a plea bargain would have caused the inevitable loss of both his business and his professional license.

(ECF No. 22, Court File at 0324–25.) The trial court agreed that Armelino's defense attorney had been ineffective to the extent he had failed to advise Armelino of the possible sentencing range(s), but, given the finding that he would never have accepted a realistic a plea offer, "inadequate pretrial performance did not affect the outcome." (*Id.* at 0326.) The Colorado Court of Appeals found that "the record support[ed]" this finding. (ECF No. 9-9 at 9.)

_____

[4] "Availability" appears to be shorthand for "availability of evidence and witnesses."

It has been clearly established by the Supreme Court since 1984 that a defendant has a Sixth Amendment right to effective assistance of counsel. *See generally Strickland v. Washington*, 466 U.S. 668 (1984). Counsel is ineffective, for Sixth Amendment purposes, when (1) counsel's performance falls below an objective standard of reasonableness, and (2) counsel's deficient performance resulted in prejudice to the defendant. *Id.* at 687. Prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

It has further been clearly established by the Supreme Court since 1985 that this right to effective assistance of counsel can be violated when a defendant chooses to plead guilty based on his attorney's faulty or materially incomplete advice. *See generally Hill v. Lockhart*, 474 U.S. 52 (1985); *see also Padilla v. Kentucky*, 559 U.S. 356 (2010) (explicitly extending *Hill* to defense counsel's failure to inform a defendant about immigration consequences of a guilty plea). It has been clearly established by the Supreme Court since 2012 that the right to effective assistance of counsel is violated when a defendant turns down a plea offer based on faulty advice, *Lafler v. Cooper*, 566 U.S. 156, 163 (2012); and also, "as a general rule," when defense counsel fails "to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," *Missouri v. Frye*, 566 U.S. 133, 145 (2012).

To the extent Armelino argues that, had he known of the possible sentence(s) he faced, he would have instructed his attorney to *solicit* a plea offer, there was (and

remains) no clearly established Supreme Court law.  The Supreme Court has never

held that defense attorneys have a Sixth Amendment duty to seek a plea offer when so

directed by their clients.  It seems obvious, at least to the undersigned, that the

Supreme Court's existing decisions extend to such situations—but it likewise seemed

obvious to the undersigned that the right to present a meaningful defense was a general

right as implemented through various portions of the Bill of Rights, not a series of

compartmentalized rights for which interpretive Supreme Court precedents must be kept

segregated.  *But see Jackson*, *supra*.  Thus, Armelino's second claim fails for lack of a

clearly established right as declared by the Supreme Court.

However, Armelino's claim might be fairly characterized as grounded in a

*rejection* of a plea offer based on faulty advice—not rejection of the sort of "formal

offer[]" discussed in *Frye*, 566 U.S. at 145, but at least a rejection of an offer to begin

negotiations.  There is still a fair question whether any Supreme Court case provides

clearly established law to govern this scenario, but it is at least much closer to existing

Supreme Court decisions on the question of effective assistance during plea bargaining.

Assuming this is the proper characterization of Armelino's claim and that

decisions such as *Lafler* and *Frye* provide the proper framework, the Colorado courts

understood the proper Constitutional standard under which to evaluate Armelino's

claim, namely, a determination of whether Armelino would actually have accepted a

plea offer.  (*See* ECF No. 9-9 at 6–9; ECF No. 22, Court File at 0324–26.)  *Cf. Frye*, 566

U.S. at 148 ("where a defendant pleads guilty to less favorable terms and claims that

ineffective assistance of counsel caused him to miss out on a more favorable earlier

plea offer, *Strickland*'s inquiry into whether the result of the proceeding would have

been different requires [determining] whether he would have accepted the offer to plead pursuant to the terms earlier proposed" (internal quotation marks and citation omitted)).[5] And this was ultimately a factual determination. The trial court found, after listening to testimony from all of the relevant actors, that Armelino was not credible in his postconviction assertion that he would have accepted a plea offer. The Court of Appeals found that the record supports this conclusion, and this Court cannot say either the trial court reached "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), or that the Court of Appeals somehow violated clearly established law in upholding the trial court on the record presented, *id.* § 2254(d)(1).[6]

### III. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The Recommendation of the United States Magistrate Judge (ECF No. 39) is ADOPTED;

---

[5] The trial court made its decision in 2011, before the Supreme Court decided *Lafler* and *Frye*. However, the Court of Appeals ruled in 2014, two years after *Lafler* and *Frye*. To be sure, neither the trial court nor the Court of Appeals applied *Lafler* or *Frye* directly. Both instead relied on a Colorado Supreme Court decision, *Carmichael v. People*, 206 P.3d 800 (Colo. 2009), which holds that ineffective assistance claims are available when a defendant chooses to reject a plea offer based on faulty advice; but, to show prejudice, such a defendant must present some sort of evidence, apart from his or her own testimony, that he or she would have actually accepted the plea offer. *Id.* at 804–07. *Carmichael* is really a case about the type of evidence necessary to find prejudice, but it is nonetheless consistent with the U.S. Supreme Court's requirement, quoted above, that prejudice turns in part on whether a defendant would have accepted a plea offer. *Cf. Harrington*, 562 U.S. at 98 ("a state court need not cite or even be aware of our cases under § 2254(d)").

[6] In addition, any claim for ineffective assistance based on failure to *solicit* a plea offer must surely include within its prejudice analysis the factual questions of whether the prosecutor would have offered a plea deal and what sort of plea deal it would have been. There was sufficient evidence from which the Colorado courts could conclude that the prosecutor would never have offered the type of plea deal that Armelino would have been willing to accept.

2.    Armelino's Objection (ECF No. 50) is OVERRULED;

3.    Armelino's Petition for Writ of Habeas Corpus (ECF No. 1) is DENIED;

4.    Pursuant to 28 U.S.C. § 2253(c), no certificate of appealability will issue because Armelino has not made a substantial showing of the denial of a constitutional right;

5.    Pursuant to 28 U.S.C. § 1915(a)(3), any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of appeal.  *See Coppedge v. United States*, 369 U.S. 438 (1962).  If Armelino files a notice of appeal he also must pay the full appellate filing fee (currently $505) or file a motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Federal Rule of Appellate Procedure 24; and

6.    The Clerk shall enter final judgment in favor of Defendants and against Armelino, and shall terminate this case.  The parties shall bear their own costs.

Dated this 14th day of June, 2017.

BY THE COURT:

_____
William J. Martínez
United States District Judge